**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 24-2947
_____

DR. PAUL BRYMAN, DO, FACOI, AGSF, CMD,
                              Appellant

v.

PHIL MURPHY, Governor of New Jersey; MATTHEW J. PLATKIN, in his official capacity as Attorney General of New Jersey; JUDITH PERSICHILLI, in her official capacity as New Jersey Health Commissioner; ANTONIA WINSTEAD, in her official capacity as Executive Director of New Jersey Board of Medical Examiners; GRACE MACAULAY, in her official capacity as the prosecutor of Camden County, New Jersey

_____

On Appeal from the United States District Court
for the District of New Jersey
(No. 1:23-cv-12601)
District Judge: Hon. Renée Marie Bumb

_____

Argued: September 17, 2025

Before: BIBAS, MONTGOMERY-REEVES, and AMBRO,
*Circuit Judges*

(Filed: December 5, 2025)

Ryan M. Chabot　　**[ARGUED]**
David B. Bassett
WILMER CUTLER PICKERING HALE & DORR
7 World Trade Center
250 Greenwich Street
New York, NY 10007

Kevin Diaz
COMPASSION & CHOICES
520 SW 6th Ave., Suite 1205
Portland, OR 97204
　　*Counsel for Appellants*

Stephen Ehrlich　　**[ARGUED]**
Francis X. Baker
NEW JERSEY ATTORNEY GENERAL'S OFFICE
25 Market Street
Richard J. Hughes Justice Complex
Trenton, NJ 08611
　　*Counsel for Appellees*

_____

OPINION OF THE COURT
_____

BIBAS, *Circuit Judge*.

Death brings good things to an end, but rarely neatly. Many terminally ill patients face a grim reality: imminent, painful death. Some may want to avert that suffering by enlisting a doctor's help to end their own lives. New Jersey lets its residents make that choice—but only its residents.

The Constitution lets it draw that line. States may keep certain goods and services in-state. Plaintiffs' claims to the contrary are at best legally uncertain.

Through the uncertainty, this much is clear: New Jersey has sound reasons to limit this grave choice to its own residents. Protecting vulnerable patients and their doctors (not to mention avoiding friction with other states) justifies the residency requirement under any applicable test.

The Constitution leaves moral questions like these to the states. New Jersey has answered them carefully, so we will affirm.

## I. ASSISTED SUICIDE, LIMITED TO GARDEN STATERS

### A. New Jersey legalizes doctor-assisted suicide for New Jerseyans

Doctor-assisted suicide is no ordinary policy choice. It asks legislatures to weigh life against death. On one side stand some terminally ill patients who understandably want to control and limit their suffering. On the other side stand the preciousness of life, efforts to shield the vulnerable from undue influence and their doctors from prosecution or liability, and the need to preserve harmony among the states. Legislatures do not make

that choice lightly. A state may legitimately worry about safeguarding the sick and depressed from feeling pressure to die too soon.

There is no easy answer. Yet most states have stayed with the same one. More than three dozen keep the door to suicide shut. Appendix, *infra*, pp. 16–20 (collecting state laws). At least thirty-five of those treat assisting suicide as a crime, making no exception for medical assistance. *Id.*

Only ten states plus Washington, D.C., now let doctors assist suicide; an eleventh is about to join them. *Id*. Most strike the same balance. All limit doctors' assistance to prescribing pills that the patient takes herself. All insist on safeguards, like waiting periods between the request and the prescription. *See Medical Aid in Dying as an End-of-Life Option Offers Death with Dignity*, DEATH WITH DIGNITY (Mar. 29, 2023), [https://perma.cc/9KSH-V65B]. None lets doctors give lethal injections. *Id.* And the vast majority of them (nine out of eleven, plus D.C.) limit assisted suicide to residents. *Medical Aid in Dying: Residency Restrictions*, COMPASSION & CHOICES (May 2025), [https://perma.cc/WF4M-QYPK].

New Jersey is one of those nine. In 2019, it legalized doctor-assisted suicide for terminally ill patients. N.J. Stat. Ann. §§ 26:16-1 to -20. Under the Act, patients with a prognosis of six months or fewer to live may ask doctors to prescribe pills so they can end their own lives. §§ 26:16-3, 16-6(a)(1). They must be sure of their decision, asking twice orally plus once in writing. § 26:16-10(a). And they must reside in New Jersey. § 26:16-3, -11.

In turn, prescribing doctors must ensure that the patient's choice is free and considered. They must confirm that she is mentally competent and is asking for the prescription voluntarily. §26:16-7(c). They must follow specific procedures, keep records, and verify residency with driver's licenses, tax returns, voter registration, or the like. §§26:16-6(a)(2), -7(c), -11. If they do so, the Act shields them from civil and criminal liability as well as professional consequences. §26:16-17.

But across the Delaware River, assisted suicide is still a crime. 18 Pa. Cons. Stat. §2505 (2024). A prescription lawful in Camden can be evidence of a felony in Philadelphia. So if a New Jersey doctor prescribes a Pennsylvanian lethal pills and she swallows them back in Pennsylvania, the doctor might reasonably fear prosecution. That fear heightens the stakes for New Jersey doctors. Still, some out-of-staters want access, and some in-state doctors want to provide it.

### B. Patients and doctors challenge the residency requirement

Judith Govatos was a Delawarean with Stage IV lymphoma. She wanted the option of doctor-assisted suicide at the end. But she died (without it) after oral argument in this case.

Paul Bryman, a New Jersey doctor, wants to assist patients like her. Together, they challenged New Jersey's residency requirement under three parts of the U.S. Constitution: the Privileges and Immunities, Equal Protection, and dormant Commerce Clauses.

At first, Govatos and Dr. Bryman were joined by another patient and another doctor. Andrea Sealy, a Pennsylvanian,

suffered from metastatic breast cancer, but she too died without doctor-assisted suicide before this appeal. Deborah Pasik, another New Jersey doctor, retired during the litigation.

The District Court dismissed the complaint. It reasoned that doctor-assisted suicide is not a fundamental privilege that states must give to nonresidents, that there was no economic protectionism, and that the law survived rational-basis review. We review de novo. *Kalu v. Spaulding*, 113 F.4th 311, 324 (3d Cir. 2024).

### C. The last remaining plaintiff has standing

This case is justiciable. Though Govatos's claim is moot, Dr. Bryman satisfies Article III standing requirements as the regulated party. As the Supreme Court has explained, "[g]overnment regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). This includes doctors who want to assist suicides but are blocked by state law. *Washington v. Glucksberg*, 521 U.S. 702, 707 (1997).

Bryman also clears the prudential bar on third-party standing. While the Court has not definitively outlined when third-party standing is allowed, it has often resolved the question by comparing the case at hand to prior standing cases. *All. for Hippocratic Med.*, 602 U.S. at 384 (quoting *Allen v. Wright*, 468 U.S. 737, 751–52 (1984)); *Trump v. CASA, Inc.*, 606 U.S. 831, 866 (2025) (Alito, J., concurring) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U. S. 118, 127 n.3 (2014)). That settles it for us. Similar claims have been brought

by doctors before, and we are bound by that precedent. *See, e.g.*, *Glucksberg*, 521 U.S. at 707.

Courts need not accept every would-be proxy. But two terminally ill plaintiffs died during this litigation alone. That underscores the practical barrier to direct patient suits and satisfies whatever prudential considerations may matter here. *Cf. Powers v. Ohio*, 499 U.S. 400, 414–15 (1991) (letting a criminal defendant raise the rights of African Americans struck from a jury). So Bryman can challenge the law, asserting his patients' rights to travel and access medical services.

## II. THE ACT DOES NOT VIOLATE NONRESIDENTS' PRIVILEGES AND IMMUNITIES

First is Bryman's challenge under Article IV's Privileges and Immunities Clause. Whether we apply heightened scrutiny turns on whether the Act's residency requirement abridges a fundamental privilege or immunity. That is doubtful. But even if it does, the Act survives.

### A. Bryman leans heavily on shaky ground

Bryman rests this claim largely on one case, *Doe v. Bolton*, the lesser-known twin of *Roe v. Wade*. *Doe*, 410 U.S. 179 (1973); *Roe*, 410 U.S. 113 (1973), *overruled by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022). On the same day that the Court decided *Roe*, it struck down Georgia's abortion restrictions in *Doe.* In passing, *Doe* said that the Privileges and Immunities Clause protects people who travel to other states for medical care, "[j]ust as [it] protects persons who enter other States to ply their trade." 410 U.S. at 200.

Bryman highlights this language. But *Doe* barely sketches the idea, and it did not have to at all. There was no out-of-state plaintiff challenging Georgia's law. *Id.* at 184–85.

On its own terms, *Doe* offers slim support. Post-*Dobbs*, its support is even slimmer. *Doe* and *Roe* rose together, on the same day, with *Doe* building on *Roe*'s newly announced right to abortion. *See Doe*, 410 U.S. at 195. So overruling *Roe* destroyed *Doe*'s foundation. That leaves *Doe*'s nod to the Privileges and Immunities Clause standing alone, if at all.

## B. Out-of-staters do not get full privileges, but only fundamental ones

Article IV's Privileges and Immunities Clause protects only a select set of traditional fundamental privileges, those "basic to the maintenance or well-being of the Union." *Baldwin v. Fish & Game Comm'n of Mont.*, 436 U.S. 371, 388 (1978). Sometimes, it works together with the Equal Protection and Commerce Clauses to protect a collection of rights associated with the freedom of movement. *See, e.g.*, *Zobel v. Williams*, 457 U.S. 55, 60 n.6 (1982); *Edwards v. California*, 314 U.S. 160, 173 (1941); *Hicklin v. Orbeck*, 437 U.S. 518, 525 (1978).

The Supreme Court has distilled three strands of those rights to travel: (1) to enter and exit states; (2) to be treated as a "welcome visitor" when temporarily in another state; and (3) to migrate and be treated equally as a new resident. *Saenz v. Roe*, 526 U.S. 489, 500 (1999).

Each strand rests on a different constitutional foundation. This case implicates neither (1) entry or exit nor (3) migration. Rather, Bryman invokes the second strand for "welcome

visitor[s]" protected by the Privileges and Immunities Clause. *Saenz*, 526 U.S. at 500–02. But visitors need not get all rights, just a core set of traditional privileges.

The basic privileges include earning a living, using courts, holding property, and paying equal taxes. *Corfield v. Coryell*, 6 F. Cas. 546, 551–52 (C.C.E.D. Pa. 1825) (Bushrod Washington, J.). Following *Corfield*, the Supreme Court has applied the Clause mostly to economic privileges. *See Toomer v. Witsell*, 334 U.S. 385, 403 (1948) (commercial fishing licenses); *Hicklin*, 437 U.S. at 533–34 (employment preferences); *S. Ct. of N.H. v. Piper*, 470 U.S. 274, 283 (1985) (bar admission). And courts have resisted expanding the list. *See, e.g.*, *Baldwin*, 436 U.S. at 388 (recreational hunting); *McBurney v. Young*, 569 U.S. 221, 226–27 (2013) (FOIA requests).

*McBurney* is especially instructive. Virginia limited its state freedom-of-information act to Virginians. A Rhode Islander and a Californian demanded the same access, but the Supreme Court refused. *Id.* at 224. Because there was no longstanding privilege of getting such information, it was not fundamental. *Id.* at 232–34 (citing *Corfield*, 6 F. Cas. at 551).

The same is true here. There is no longstanding tradition of doctor-assisted suicide. On the contrary, there is a centuries-long tradition against it. That is why the Supreme Court rejected it as a fundamental right. *See Glucksberg*, 521 U.S. at 710–19. *Glucksberg* likewise dooms any claim that doctor-assisted suicide is a traditional *privilege*. Whether a privilege requires more historical support than a fundamental right or less, this one—recognized in fewer than a quarter of the states—has not "at all times[ ] been enjoyed by the citizens of

9

the several states." *Corfield*, 6 F. Cas. at 551. It is only "of relatively recent vintage." *McBurney*, 569 U.S. at 234.

Bryman asks us to reframe the privilege more broadly as travelling to get general medical care. We are skeptical about abstracting the claimed privilege to such a high level of generality. But even if we abstract it that much, Bryman's support remains thin. Though *Doe* appeared to recognize that privilege, its analysis was cursory. 410 U.S. at 200. And it is the only medical case involving visitors, not new residents. Still, *Saenz* cites *Doe* approvingly, though only in passing. 526 U.S. at 502. So for now, let us grant Bryman's premise.

### C. Even if *Doe* remains good law, the Act stands

Even if general medical care is a fundamental privilege and doctor-assisted suicide counts as general medical care, New Jersey's Act survives scrutiny under the Privileges and Immunities Clause.

When a law touches a fundamental privilege, courts scrutinize whether the law's means fit its ends. Though we rarely do so on a motion to dismiss, this is the rare case because we have enough legislative facts to resolve the issue. To show that nonresidents are a "peculiar source of the evil" targeted by the law, the state must show both a "substantial reason" to treat outsiders differently and a "substantial relationship" between the difference in treatment and the state's objective. *Toomer*, 334 U.S. at 398 (first quotation); *Piper*, 470 U.S. at 284 (second and third quotations).

The means fit the ends. New Jersey has good reasons for its residency requirement. First, it protects doctors. The Act

10

shields doctors from criminal and civil liability in New Jersey. N.J. Stat. Ann. §26:16-17; Oral Arg Tr. 37:20–38:2 (making this argument). But it cannot protect doctors from prosecution in states where assisted suicide remains a crime. States retain some authority to enforce their own criminal laws beyond their borders. *See United States v. Lee*, 359 F.3d 194, 206 (3d Cir. 2004) (Alito, J.); *e.g.*, 18 Pa. Cons. Stat. §102(a); N.Y. Crim. Proc. Law §20.20(2). If New Jersey let nonresidents get prescriptions for lethal pills and those nonresidents return home with them, the other states could try to prosecute the doctors. So the law aims to keep both patients and pills in-state.

Relatedly, the Act prevents friction among states. Some states hold to the traditional bans on assisting suicide; New Jersey does not. Cabining its policy preference in this morally fraught area preserves interstate harmony. That is one of the Constitution's central goals. *See, e.g.*, U.S. Const. pmbl. (setting forth the aim of "insur[ing] domestic Tranquility").

The Act also protects patients. It bans insurance companies and other third parties from writing contracts that pressure patients to follow through once they ask to die. §26:16-14; JA 62 ("The Act prohibits provisions in contracts, wills, insurance policies …. That helps protect terminally ill New Jerseyans from undue influence…. [T]he State's ability to guard against undue pressures affecting terminally ill patients in other jurisdictions is much more limited. The states' police powers to protect health and safety are matters of "local concern," directed toward the general welfare of their citizens.") (citations omitted). But New Jersey cannot police insurance policies or malpractice claims made under other states' laws, so it cannot safeguard nonresidents from coercion as

effectively. *See Ginsberg ex rel. Ginsberg v. Quest Diagnostics, Inc.*, 117 A.3d 200, 222 (N.J. App. Div. 2015) (explaining that "[p]rofessionals and their patients have a reasonable expectation that the laws of the state of licensure will govern the licensee's activities within the state where the services are provided" and thus applying local law to medical malpractice); *Viking Pump, Inc. v. Century Indem. Co.*, 2 A.3d 76, 89 (Del. Ch. 2009) (noting that, for insurance contracts, "Delaware courts have applied the law of the jurisdiction that bears the most significant relationship to the insurance coverage as a whole").

Although only these three justifications have been properly raised and are apparent at this early stage, there may be others as well. *See Glucksberg*, 521 U.S. at 730 (considering role of mental health); §§ 26:16-6(a)(3)–(6), 8, 10(c) (requiring local mental-health screenings for patients); Oral Arg. Tr. 36:20–37:16.

In sum, New Jersey's justifications are weighty, rooted in real dangers of extending doctor-assisted suicide to nonresidents. And its response is well tailored to further those justifications. Even if it could have chosen a means narrower than excluding all out-of-staters, the Privileges and Immunities Clause requires only a "substantial relationship" between means and ends, not a perfect one. *Piper*, 470 U.S. at 284. The Act satisfies that standard.

### III. THE ACT CLEARS EQUAL-PROTECTION SCRUTINY

For these same reasons, the Act comports with the Equal Protection Clause. Residency classifications are not inherently suspect. *See Hooper v. Bernalillo Cnty. Assessor*, 472 U.S.

612, 618 (1985). They trigger heightened scrutiny only if they infringe on a fundamental right.

There is none here. *Glucksberg* foreclosed any right to die, and Bryman knows it. 521 U.S. at 728; *see also Vacco v. Quill*, 521 U.S. 793, 799 (1997). He claims only a fundamental right to interstate travel. But that right runs only as far as the Privileges and Immunities Clause for the "welcome visitor." *Saenz*, 526 U.S. at 501. So the privileges-and-immunities analysis above disposes of that claim.

Thus, the Act faces only rational-basis review. Shielding doctors from liability, preventing interstate friction, protecting patients from insurers' pressure, and preventing rash decisions made in agony or depression are all legitimate governmental interests, and the Act rationally furthers them.

### IV. THE ACT DOES NOT VIOLATE THE DORMANT COMMERCE CLAUSE EITHER

The Constitution gives Congress, not states, the power to regulate commerce among the states. U.S. Const. art. I, § 8, cl. 3. When Congress is silent, the so-called *dormant* Commerce Clause blocks states from favoring their own businesses or interfering with their neighbors' businesses. In other words, it guards against economic protectionism. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023).

Laws that block the flow of goods or services or openly discriminate against out-of-state businesses raise red flags. *See Hughes v. Oklahoma*, 441 U.S. 322, 337 (1979) (limiting exports); *City of Philadelphia v. New Jersey*, 437 U.S. 617, 628 (1978) (limiting imports); *Granholm v. Heald*, 544 U.S.

13

460, 467 (2005) (favoring in-state over out-of-state wineries); *New England Power Co. v. New Hampshire*, 455 U.S. 331, 338 (1982) (favoring in-state utility customers). Those laws must be "narrowly tailored to advance a legitimate local purpose." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 518 (2019) (cleaned up). Only laws with no reasonable, non-discriminatory alternative pass the test. *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354–56 (1951).

Even neutral laws may be impermissibly protectionist if they burden interstate markets by regulating in-state products. *Nat'l Pork*, 598 U.S. at 377; *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 350–54 (1977); *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298 n.12 (1997). In those cases, courts ask if the law serves a legitimate local interest and if the burden on interstate commerce clearly outweighs the benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

The *Pike* balancing test aims to preserve legitimate state health and safety regulations, even if the regulations spill across state borders. *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 443–44 (1960). It bars laws only if they "build up [a state's] domestic commerce" by placing "unequal and oppressive burdens upon the industry and business of other States." *Guy v. City of Baltimore*, 100 U.S. (10 Otto) 434, 443 (1879).

But we need not do means-ends analysis, because New Jersey's law does none of these things. This is primarily moral, not commercial, legislation. And the case "quite literally … [asks whether New Jersey] can deny out-of-state citizens a benefit that it has conferred on its own citizens"—which fits under

privileges and immunities. *McBurney*, 569 U.S. at 236; *see Toomer*, 334 U.S. at 396–99 (commercial shrimping license fees); *Mem'l Hosp. v. Maricopa Cnty.,* 415 U.S. 250 (1974) (striking down a residency requirement for free county medical care).

Although Bryman tries to fit the case into the dormant Commerce Clause, that is not where it belongs. As the Supreme Court has explained, the dormant Commerce Clause cannot remedy these types of claims. *McBurney*, 596 U.S. at 235–36. So this claim fails too.

\* \* \* \* \*

In our federal system, states are free to experiment with policies as grave as letting doctors assist suicide. Other states are free to keep it a crime. This novel option does not appear to be a fundamental privilege, let alone a fundamental right, that states must accord visitors. But even if we reframe it as one, New Jersey has good reasons to limit it to New Jerseyans: protecting doctors from prosecution, preventing friction with other states, guarding patients from coercion, and ensuring that their decisions are rational and considered. We will thus affirm the District Court's dismissal.

### Appendix: Assisted-Suicide Laws by State

| State | Status | Statute/Caselaw |
|---|---|---|
| Alabama | Doctor-assisted suicide is a crime | Ala. Code §22-8B-4(b) |
| Alaska | Doctor-assisted suicide is a crime | Alaska Stat. §11.41.120(a)(2) (assisted suicide); *Sampson v. State*, 31 P.3d 88 (Alaska 2001) (no medical exception) |
| Arizona | Assisted suicide is a crime | Ariz. Rev. Stat. Ann. §13-1103(A)(3) |
| Arkansas | Doctor-assisted suicide is a crime | Ark. Code Ann. §5-10-106 |
| California | Doctor-assisted suicide is legal for residents | Cal. Health & Safety Code §443 |
| Colorado | Doctor-assisted suicide is legal for residents | Colo. Rev. Stat. §§25-48-101 to -124 |
| Connecticut | Assisted suicide is a crime | Conn. Gen. Stat. §53a-56(a)(2) |
| Delaware | Doctor-assisted suicide will be legal for residents, effective Jan. 1, 2026 | Del. H.B. 140, 153rd Gen. Assemb. (2025) |
| Florida | Assisted suicide is a crime | Fla. Stat. §782.08 |

| | | |
|---|---|---|
| Georgia | Assisted suicide is a crime | Ga. Code Ann. §16-5-5 |
| Hawaii | Doctor-assisted suicide is legal for residents | Haw. Rev. Stat. §§327L-1 to -25 |
| Idaho | Assisted suicide is a crime | Idaho Code §18-4017 |
| Illinois | Assisted suicide is a crime | 720 Ill. Comp. Stat. 5/12-34.5 |
| Indiana | Assisted suicide is a crime | Ind. Code §§35-42-1-2 to -2.5 |
| Iowa | Assisted suicide is a crime | Iowa Code §707A.2 |
| Kansas | Assisted suicide is a crime | Kan. Stat. Ann. §21-5407 |
| Kentucky | Assisted suicide is a crime | Ky. Rev. Stat. Ann. §216.302 |
| Louisiana | Assisted suicide is a crime | La. Stat. Ann. §14:32.12 |
| Maine | Doctor-assisted suicide is legal for residents | Me. Stat. tit. 22, §2140 |
| Maryland | Assisted suicide is a crime | Md. Code. Ann, Crim. Law §3-102 |
| Massachusetts | Doctor-assisted suicide is a crime | *Kligler v. Att'y Gen.*, 198 N.E.3d 1229 (Mass. 2022) |
| Michigan | Assisted suicide is a crime | Mich. Comp. Laws §750.329a |

| State | Status | Citation |
|---|---|---|
| Minnesota | Assisted suicide is a crime | Minn. Stat. §609.215 |
| Mississippi | Assisted suicide is a crime | Miss. Code Ann. §97-3-49 |
| Missouri | Assisted suicide is a crime | Mo. Rev. Stat. §404.845 |
| Montana | Doctor-assisted suicide is legal (residency requirement unclear) | *Baxter v. State*, 224 P.3d 1211 (Mont. 2009) |
| Nebraska | Assisted suicide is a crime | Neb. Rev. Stat. §28-307 |
| Nevada | Assisted suicide is a crime | Nev. Rev. Stat. §200.030 |
| New Hampshire | Assisted suicide is a crime | N.H. Rev. Stat. Ann. §630:4 |
| New Jersey | Doctor-assisted suicide is legal for residents | N.J. Stat. Ann. §§26:16-1 to -20 |
| New Mexico | Doctor-assisted suicide is legal for residents | N.M. Stat. Ann. §§24-7c-1 to -8 |
| New York | Assisted suicide is a crime | N.Y. Penal Law §§120.30, 125.25 |
| North Carolina | No crime of assisted suicide | N.C. Gen. Stat. §§14-17, 14-17.1 |

| State | Status | Citation |
|---|---|---|
| North Dakota | Assisted suicide is a crime | N.D. Cent. Code §12.1-16-04 |
| Ohio | Assisted suicide is a crime | Ohio Rev. Code Ann. §3795.04 |
| Oklahoma | Assisted suicide is a crime | Okla. Stat. tit. 63, §3141.3 |
| Oregon | Doctor-assisted suicide is legal for all | Or. Rev. Stat. §§127.800–.995 |
| Pennsylvania | Assisted suicide is a crime | 18 Pa. Cons. Stat. §2505 |
| Rhode Island | Doctor-assisted suicide is a crime | 11 R.I. Gen. Laws §11-60-3 |
| South Carolina | Assisted suicide is a crime | S.C. Code Ann. §16-3-1090 |
| South Dakota | Doctor-assisted suicide is a crime | S.D. Codified Laws §34-12D-23 |
| Tennessee | Assisted suicide is a crime | Tenn. Code Ann. §39-13-216 |
| Texas | Assisted suicide is a crime | Tex. Penal Code Ann. §22.08 |
| Utah | No crime of assisted suicide, but implied unlawful | Utah Code Ann. §76-5-203 (homicide); §75A-3-103 (implied unlawful) |
| Vermont | Doctor-assisted suicide is legal for all | Vt. Stat. Ann. tit. 18, §§ 5281–5293 |

| | | |
|---|---|---|
| Virginia | Civil sanctions for assisted suicide | Va. Code Ann. §8.01-622.1 |
| Washington | Doctor-assisted suicide is legal for residents | Wash. Rev. Code §§70.245.010 to .904 |
| West Virginia | Doctor-assisted suicide is a crime | H. Jt. Resol. 28, 2024 W. Va. Leg., Reg. Sess. (Mar. 9, 2024); W. Va. Const. art. III §3-23. |
| Wisconsin | Assisted suicide is a crime | Wis. Stat. §940.12 |
| Wyoming | No crime of assisted suicide, but implied unlawful | Wyo. Stat. Ann. §§6-2-101 to -108 (homicide); §35-22-414 (implied unlawful) |
| District of Columbia | Doctor-assisted suicide is legal for residents | D.C. Code §§7-661.01 to .16 |